May it please the Court, my name is Walter Koontz, K-O-O-N-T-Z, and I represent the appellants in this matter. I'd first like to take the opportunity to say thank you very much for giving me the opportunity to argue before you today. I do have a variety of different prepared statements that I was thinking about giving, but I did want to inquire first of Your Honors whether there were any specific issues or questions in your mind that I may not have addressed in the briefs that may be of significance in your decision-making process that I should talk about first. How do you get an intangible right to decision-making into an injury to business that has caused a financial loss for purposes of RICO? Well, I'm not quite sure, Your Honor, I would understand that concept. I believe the nature of the injury that we've alleged is the loss through misappropriation or theft of ex-corporal embryos and other gametes that were well outside of the body or the bodily interest or control of the appellants at the time that the misappropriation took place. And certainly the ova and the gametes had a very significant commercial value that can be readily quantified. That's what your client wanted to do, was to sell them? Absolutely not, Your Honor. To your clients, their value was the ability prospectively, possibly, to be fertilized and produce a child eventually, maybe. Well, I think in... And that's the value that the State of California has recognized that genetic material has. In the State of California right now, the most current and relevant decision is the Hecht case. Yes. And I believe that the Hecht case does, in fact, preponderate and side in favor of the appellants to recognize property interest. And what we're talking... You understand, I'm not asking you a question about whether there is or is not some kind of property interest. My question was, how do you get an intangible right to make decisions about genetic material into an injury to property for purposes of RICO, and on account of which there is a financial, a concrete financial loss from abuse? Well, let's start with the basic financial loss, and that is the money that was expended in order to allow for the procedures to take place. That was in order to conceive. Okay. Now, the body of rights that we're talking about here, though Your Honor suggests that they're intangible, is no different than the intangible body of rights that would be recognized for a RICO cause of action if we were talking about washing machines. It's really the question of the overall interest that an individual has in a certain thing. Of all the things that we have clearly said in this circuit, that intangible interest, even very valuable ones, do not suffice. Well, there's a big difference. I think an embryonic structure is a tangible item, even though we're talking about a certain pre-designed use intended to get my clients pregnant. It had a very, very valuable commercial use, and the reason why it was taken was because of a financial value to the physicians that stole them in the first place. And that is very well brought out, I believe, in the complaint. I mean, I think this is really ‑‑ I recognize that this district has been having to deal with some really interesting interpretations of what would be a sufficient injury for purposes of RICO. And I don't think going back through them today would be of any real value, but the fact of the matter is, these are tangible items. These structures have a very definite value. They did in 1992 and 93, 94 to the physicians. Mr. Cohen, Judge, I was asked about the value of these items to your clients, and I had not ‑‑ maybe you can help me out here. I had not focused on that aspect of the case. Does the complaint contain allegations as to what your clients plan to do with these things? With the embryos. I mean, I am ‑‑ they could have been given, for example, if Mrs. D. had a sister who was unable to conceive a child, she could have donated the egg, I suppose, one of the gametes or one of the ‑‑ That's correct, Your Honor. The percentages that actually are involved in the ability to be able to carry through full time. They could not have sold them, right, under California law, but they could make them a gift to a family if there were some other member of the family or some ‑‑ They could donate them for a fee. That's correct, Your Honor. Well, not necessarily for a fee. They could potentially donate them for a fee for research. They're very valuable. Now they're very valuable as structures of ‑‑ Would they be tax deductible? I'm sorry, Your Honor? Would such a donation be tax deductible? Well, that's a good question, but I think that ‑‑ I guess one will get ‑‑ If you evaluated the IRS's rules, it probably wouldn't be, most likely. But it's really ‑‑ I'm sorry. I asked you a question that I didn't get a chance to answer. Maybe you don't know. Okay. Let me back up. On what the complaint alleges regarding your client's use of the ‑‑ intended use of the items. Okay, Your Honor. If we look at the complaints in the paragraphs that were defining the period of time in which they had attended the clinic, what you'll see is consent forms that they signed in advance of each one of their gift procedures in which they were instructing, as the clinic requested, what to do with your surplus embryos. And they gave, in each one of those consent forms, very specific instructions that they were to be frozen for their future use. And they made that very clear. Now, each time ‑‑ But did they ‑‑ does the complaint contain an obligation as to what that future use would be? For their future use to ‑‑ in the event they need them to achieve pregnancy. Now, they went through three gift procedures, and I think seven for embryo transfer procedures, but they never got pregnant. The complaint alleges that. Yes, Your Honor. It does. Counsel, I'm a little interested beyond the ethereal property claim we're talking about now, or quasi-property, if we want to call it. You did say in your complaint that you lost money. You didn't flesh that out particularly. You say in your briefing here something to the effect that you lost money and that you were required to go through unusual or additional procedures. Apparently you never said that to the district court. That first comes up in a district court footnote when it's granted the dismissal here. What are we talking about? I mean, are you suggesting to us that the problem is that you didn't get a lead to amend to spell out these other, quote, let's say, concrete actual losses? My concern ‑‑ What are those that you're talking to us about? Of course, they're not in the record, but I take it that's what you're saying to us. Well, I guess if what you suggest, Your Honor, is correct, then I don't know how I could possibly ever convince this panel or any other jurist that an embryonic structure is, in fact, a piece of commercial property to the defendants in this case and has commercial value to it, and that in this particular case, if you don't recognize that issue, and I think that the allegation in normal instances that money was part of the injury to the property of an individual, in any other complaint, there wouldn't be a question of how much exactly is needed to be stated in the complaint for it to pass a 12B6 motion to muster. I think I understand your answer. I'm not sure. Are you saying that the money value you're talking about is the value of the material itself? That's what you mean by money? What we mean by money is the money. If we said we see ‑‑ we think that's not a sufficient property, monetary interest, are you finished? In your view, is this case over, then? No, I don't believe it is over. Because? Because at least by the parameters as I understand it of bringing the cause of action forward, the question of whether or not one's property has been injured and whether it is one's property is reserved for the jury as a question of fact. And I can't understand why, without any ‑‑ I want to be very clear. It's important to me to know what you're telling me. When you talk about one's property, and you said that's a question for the jury. That's correct. One's property is referring now to the materials in question. Is that true? That's part of it, yes, Your Honor. Well, what's the rest of it? The money expended in order to have the surgeries take place to generate the community of embryos in OVA. So if we said, are you saying to me now, if we said, well, there is no such property in these materials, you are saying to us, this case isn't over anyway because these guys defrauded us of money that we had to pay them to do X, and they didn't do X. Is that correct? That's correct, Your Honor. And that's what you mean by money when you put it in your complaint? That's correct, Your Honor. All right. Did you argue that's what you meant by money to the district judge? Well, Your Honor, I'm not sure, looking at the trial, not knowing. Did you argue it to the district judge? The answer is yes or no, didn't you? Well, I believe we did, because we had placed it in the complaint as part of the case. Beyond the fact that the complaint says money, and as you were talking to me a few minutes ago when we started off, money could mean the value of that property. They could sell it. That's money. I'm asking you, you are now pretty, seem to be saying, at least in the introduction to your brief, well, we mean what you said now, the cost of the procedures that they purported to need to do to us, but that was all fraudulence. They didn't need to do that procedure at all. That's what you're saying to us. I'm just asking, did you say that to the district court at all, or does this all come up after the district court grants the 12-day sex without leave to amend? When does this thought that this additional thing you're also suing for is part of this case? Where does that come from? Your Honor, I'm sorry. I just wanted to make sure I did reserve about five minutes of time for rebuttal. But in answering your question, I believe that in the second hearing that we had on this motion, the focus of the discussion was only with regard to what we considered to be the support for finding that an embryo would have be considered a sufficient property interest. I was somewhat concerned and mentioned in my opening brief that there wasn't, in the order by Judge Carter, there was not any discussion whatsoever regarding the allegation that we had made in the complaint that not only had the ovas and the embryos been taken, but there was additionally money that had been alleged to have And I don't know if there's any other property that may have been involved or taken in this circumstance, because I don't have the evidence yet. I don't know what actually happened with this procedure at this point in time. I mean, that's the purpose of being able to at least go through a modicum of discovery. The money you're talking about is money to compensate your client for loss of what they say were stolen, destroyed, or whatever. Embryonic material. Yes, Your Honor. Not a loss from a lost opportunity to sell that material. No. No, Your Honor. My client's never had any intent to sell. Why is that not a loss that is in the nature of or derivative from the emotional distress or breach of the consent or malpractice or whatever? Fraud that happened to your clients. Well, it arises from the misappropriation of genetic materials that had just been aspirated from us. And why is that loss not in the nature of compensation for the emotional distress that your clients suffered when they found out about it? Because the fact that the basis of the claim under RICO relates to the law. I know. It has to. But just explain to me why I'm wrong in saying that that loss is to compensate your client for the distress that occurred to them when they realized that all of the material that they thought they had stored wasn't. The amount of money that they expended on the procedures is in no way. Expend the money in order to get money from the material that was generated by the procedures. We agreed on that. Well, they have to spend more money to try and get more embryos, Your Honor. Sure. But you agree they didn't spend that money in order to get money. Absolutely not. They spent the money in order to be able to assure themselves a chance of getting pregnant. That's correct. Okay. So when it turned out that that chance to get pregnant may have been interfered with in some way, why is the loss not in the nature of a loss of compensation, not in the nature of emotional distress? Because the – Regular, ordinary, personal injury. And it's very understandable. So I'm not questioning that. I'm sure that they were horrified. And for that, there is a remedy. And it's a normal tort remedy for personal injury, isn't it? I respectfully disagree, Your Honor, because the – How? Whether or not the – in the first instance, the gametes had been taken and there was emotional distress derived from that, that emotional distress in some other action could be treated as general damages. In this particular case, we're talking about a special category of damage, which is a recovery of the money that was already expended, which they are going to need in order to go back through the procedures again. There's a very big difference. Okay. Mr. Kuntz, I ask you a question, but it's on my time, okay? So I'll give you back that time for rebuttal. Just explain to me – why don't you stop the clock? Thank you, Your Honor. This is not a legal argument. This is a factual. What exactly were the – you said embryos and other gametes or something. I just want to make sure exactly what these things were. Can you just, as a legitimate complaint – Yes. Just tell me what they were and how they got to be, what they got – you know. You said something about aspiration. I think I have a pretty good idea of how this stuff works, but I'd like to hear from you. Very good, Your Honor. Assisted reproductive technology procedures for infertility are a relatively new area of medicine, and the object of the game is to manipulate, in essence, a female's menstrual cycle in order to allow her the opportunity to take medications designed to stimulate her ovaries to produce a multiple number of ova in the ovulation in a particular month so that they can aspirate those ova, which they do through a needle that they use in what's known as a transvaginal aspiration. So the woman gets some drug which causes a release of more than one ovum in a month. That's correct, Your Honor. Okay, and then they go in and they aspirate, which means they suck them up, they use a vacuum procedure to – That's correct, Your Honor, because each one of the – the stimulation occurs, results in a number of cysts called follicles that are developed just on the outside of the ovaries, and they're able to take this needle that they use and they pierce each one of the follicles, they pull out all the aspirate fluid. Then it is taken to a laboratory that's right next to the surgical suite, and in an electron microscope, the aspirate is examined to determine if there's an ova in there. And if there is, it is then fertilized with sperm that has already been taken from the male and is prepared and ready at the surgery site and is fertilized, and it can either – So what is aspirated is some fluid, some bodily fluid, which, if successful, has within it one or more eggs. That's correct. Okay, and those – the fluid is examined, and if an egg is found – pick up from there. Okay. If eggs are found, then the husband's or mate's sperm is at the laboratory available for one of two things. If, in the traditional sense, the patient's going to go through a gift procedure, it is designed to allow for fertilization totally to occur in the body. So they take – I want to hear only about your case. Okay. What happened? All right. In this particular case, we did undergo three different gifts. There was a total of 150 ova or more that had been aspirated from Mrs. D. And of those, approximately 40 to 50 embryos had been created. Many – In the – outside the body, the eggs are fertilized by what may – In an IVF laboratory, they're placed in, like, a Petri dish or a test tube, and then a sperm is introduced into that Petri dish or test tube, which is holding the ova. It's just swimming around. It's not surgically introduced or, you know, that sort of thing. They put the egg there, and the sperm are just there swimming around and eventually they find the egg, if successful, and fertilize it. In this particular case, yes, Your Honor. That's correct. And if – The things that were lost, you know, the cloths, were these eggs? Were they fertilized? You've talked about gametes. Okay. What are specifically the items? Ova that were extracted from Mrs. D. and embryos that were developed. Ova that had been extracted and not fertilized? Well, that's correct. They had not been fertilized. And then fertilized ova, which then would be called embryos. Well, they'd first be called zygotes and then embryos. But at the stage at which –  At which they disappeared. That's correct, Your Honor. Okay. Anything else? As far as the procedure is concerned? No, no. As far as what was taken. I just want to make sure I had clear in my mind what are the things that were lost. Oh, that's – in their case, that's really what we're talking about. Thank you very much. You've got two minutes and 37 seconds for rebuttal. Okay. It means you sit down and I'll hear from the other side. Very good, Your Honor. Unless you want to – the clock will start again and then you lose your time for rebuttal. I'm sorry? I stopped the clock for this explanation, but if you want to keep talking, you've got two minutes and 37 seconds. You can sit and save it for rebuttal or you can keep talking. Why don't I sit and save it for rebuttal, Your Honor? Very good. Okay. We'll hear from the other side. Good morning. Donovan Kokus of Greenish, Martin, Stein, and Richland on behalf of the U.C. Regents' defendants. I'd like to address something I think the Court may be a little bit confused about, which is that in the Third Amendment complaint and, indeed, in the previous iterations of the complaint, there aren't allegations that part of the monetary loss for purposes of civil RICO here was the money expended upon this procedure. Now, the complaint says they lost money, period. And none of us knows what plaintiff means by that, except that we do know the plaintiff appellant has stated that he lost money from the value of the embryos. Well, here's the problem. When the district judge rules on your last motion to dismiss, the first time that it's ruling on property as such on that part of the complaint because apparently it hadn't really ruled previously on the pleading as to property, when it rules, the district judge drops the footnote and says, I understand that money could mean other things. It could mean cost of procedures, I think, that's something of that nature. But I don't think that's very important. That's what the district judge said. If I hear them, they're saying to us now, look, we should have at least had leave to amend. If you didn't think putting money was sufficient, we should have had leave to amend to describe it further. And you just dismissed it without leave to amend. What do we do with that claim? Assuming that, assuming for the moment that that is one, that's what they think money means. Think thought. That's what they think money means. What do we do with that in the Rico case? Right. And I would say as to all four of the complaints, that never comes up. But even assuming that leave were, this were remanded for leave to amend on that point, the plaintiff's appellants haven't alleged that they were deprived of the treatment for which they came and paid. I mean, they did come, they had embryo aspirated. They did undergo a couple of gift procedures, and they weren't successful. And at the end of the day, there were some embryos remaining for plaintiff's appellants for future use. The gist of their complaint is that when they came back, there were fewer embryos than they expected there to be. If a doctor says, I remove, I perform certain kinds of surgeries, and let's assume it's got all the other connections to interstate commerce, I presume I perform certain kinds of surgeries to people who really need them. And people come to his office on a regular basis, and he says, you need that surgery and you need it and you need it and you need it. And none of these people need the surgery. And he says, by the way, it's going to cost you each $10,000 to have it. And none of them need it. But he does cut, and he goes in and he puts around, called appendix, removal of appendix. He does remove the appendix, but they didn't have any need for it. But he fraudulently tells them they do, and they reasonably rely on it. And he does all this in interstate commerce and such, and they pay him $10,000 each. Can a RICO be spelled out for that kind of business practice? It would depend upon whether what's at stake is business or property for purposes of a RICO. Under that hypothetical, I'm not sure which damages are being alleged. Damages are being alleged that I didn't have to spend $10,000 of my own money. I'd still have it in my bank account, but for the fact that you fraudulently deprived me. Just as if you said, I'm going to sell you a widget, and it costs you $10,000. And instead, color marketers do it all the time. If you'll send me $10,000, you're going to get a Cadillac. And they send you a little plastic toy Cadillac. Some people think that's a RICO violation because you paid for something you didn't need and didn't really get. And if that lost unnecessarily expended money was recognized as property under State law and not otherwise inconsistent with the RICO statute, then on that hypothetical, there may have been a RICO. And my claim is going to be I just want my $10,000 back because you have defrauded me of $10,000. Or I signed over my bank account if you wanted to seem more tangible. Or I signed over my house to you. I signed my house over to you in order to perform this operation. Understood. But that's not – and I understand the hypothetical, but that's not at all what's being alleged. Well, would that be – would that have something to do with RICO, do you think? Could you spin a RICO case on that? I'm not sure I could. Okay. I'm honestly not sure I could. But in this situation, what they're actually – if they're alleging today that they have lost some portion of their personal money for the – for undergoing these procedures, number one, there was no allegation that from the very beginning these procedures were unnecessary. The plaintiffs themselves seem to have admitted that these procedures were necessary, and later on they underwent some other procedure with a different doctor and were successful in conceiving a child. And they came back to the U.C. for, you know, the implantation of these embryos for a third time. So the plaintiffs have clearly all along thought these procedures were necessary, and there isn't an allegation that they were, you know, defrauded ad initio into coming in for something that wasn't necessary for them. So it seems to me that they've alleged that they obtained the treatment for which they paid. Well, we don't know. I mean, they might have – I mean, I don't know how often those extractions occurred or how often these eggs were fertilized, but it may be that they didn't need quite so many and that the reason they were induced to give more eggs and undergo the procedures is because the doctors wanted to have more embryos. So they might have been able to do it once or twice instead of three or four times. I mean, again, I don't know what the numbers are, but the doctors say, oh, yeah, keep doing it. Let's keep extracting. Let's keep fertilizing. We'll keep charging you for it. And really they're doing it not for the benefit of the patient, but because they think, oh, this is great. You know, we're, like, printing money. And we charge the patients for doing it, and then we sell them, you know. Isn't that sort of a fair reading of the plaintiffs? At that point, you would have to assume, I think, that – I mean, it seems to me – the plaintiffs, first of all, have not alleged that. But if that were an allegation, you would have to, number one, I think, assume that the embryos were property, that they implicated some property interest. You know, we haven't gotten to that. I think I do want to talk about the question, because if they are property, then none of this matters. Well, no, it doesn't matter. None of it matters. And then – but I think I was just following up on this financer's question. You know, your answer was, well, they did it anyway, these procedures that they paid for, and they needed to do it, and these things were just left over. But there's another scenario. The other scenario is they didn't need to do it quite as often as they did. They did it more often because the doctors, the defendants, said, oh, well, it's a cash cow. Let's get these patients to keep doing it. Let's lie to them about whether they – how many of these embryos they need, and we'll charge them for doing the procedure, and that will give us more embryos left over, you know, many more than they need, you know, than we would advise them to get if they were just concerned about their situation, and we'll get them to pay for more because we want to have the additional ones that we can make monetary – you know, we can get the financial benefits from. So they get two financial benefits. They charge for the unneeded procedure, plus they then derive the financial benefit from selling eggs. And, again, that's never been alleged here. I mean, there's been no allegations. Assume that they get another chance to amend, okay? It's a scary thought, but assume it anyway. And let's say they were to allege that on, you know, they were granted lethal – and that's exactly what they were to allege, okay? So now tell me, would that survive 12 v. 6? I still don't think it would survive 12 v. 6. Because it seems to me the nature of the injury – I mean, in the second Oscar case, this Court's en banc panel said that the Court looks to the nature of the injury being alleged. The overall nature of the injury being alleged is not some quantifiable dollar amount for X number of procedures which were unnecessary. Well, I think you're fighting the hypothetical. I mean, the idea here is they say, look, we did some of these procedures. They were bona fide procedures that were designed to help us conceive. And then they went on doing it, and they kept telling us to keep doing it, and they kept charging us for doing it even when they knew this was no longer necessary for us. They did it and advised us to do it and encouraged us to do it in order to get in more things that they could steal. That's the allegation. Assume that they were to allege that on an amended complaint. Why wouldn't that be straight? You know, they – they forced us to pay money when it was totally unnecessary for our purposes, our medical purposes. I'm still not sure that that would be consistent with the purposes of the RICO statute. Are you sure it wouldn't be? I'm not sure it wouldn't be. I mean, the concurring opinion of the Supreme Court's latest now decision sort of suggests that, to me anyway, that this would be pretty far outside the ambit of the purposes of the RICO statute. I mean, this – and it doesn't seem connectable proximately. It's very strange. You think if a doctor – if a doctor has a practice – I mean, let's say it's a dentist and has a practice of getting people to pull their teeth when they don't need to so he can sell them dentures. And so, you know, he brings them in and he has sort of false x-rays and says, look at this, rotting teeth, you know, and in fact they're not their teeth. They're sort of false dentures. And this is big, you know, perpetrated on hundreds of people where they come in with healthy teeth, get pulled healthy teeth so this doctor can – this dentist can sell them dentures. You don't think that would be – you think that's just an intangible – so, you know, get them – not only do they lose their teeth, which may be intangible, it may not be. We can sort of argue about that. But he gets them to pay hundreds of dollars for dentures they don't need. Why isn't that tangible? That strikes me as ancillary to a personal injury claim at that point. If someone's pulling teeth I don't need pulled out of my mouth. I mean, that seems to me – You may have a personal injury claim, but don't you also have a claim for fraud? I was forced to pay for a procedure and to buy a set of dentures that I didn't need. That strikes me like the guy who says you need a new muffler, when in fact you're sitting there sort of making the noise by rattling a screwdriver. Oh, look how noisy it is. They may have had a claim for fraud under that hypothetical. I mean, if we assume that this is property, again, for purposes of RICO. I suppose the question here isn't whether a wrong was done. I mean, nobody's arguing about that now, right? Well, I mean, there's – At the pleading stage. Okay. I mean, a wrong was done. That's not the issue. The issue is whether that wrong comes within the parameters of RICO. And it doesn't seem to, because it seems to be, as plaintiffs themselves have admitted, the purposes of harvesting these embryos, it was really just one purpose, to potentially conceive a child. So what? Well, that would be – No, I guess this is the question about embryos are property. Why are they not property? They're a tangible thing. They're outside the body. When it comes to the embryos as opposed to the eggs themselves, they've actually been manipulated. They're not only the way they were in the body. They're different from the sperm and different from the egg by the use of human labor or human ingenuity, which is paid for, by the way.  Well, that strikes me as – You can use them to fertilize yourself. You can give them away to your sister or your cousin. You might be able to donate them to charity. Let's say somebody's famous and somebody would love to have a – they can't have children of their own. They say, well, we'll get sort of the embryo of Arnold Schwarzenegger and his wife. This would be very nice to have if you can't have your own children. Why isn't that the kind of thing that's exactly the kind of thing that is property? Well, because I think it implicates the liberty interest and privacy interest, frankly, of making reproductive decisions. Perhaps it does. Perhaps it does, that too. Very often things implicate more than one interest.  Why are they not just like every other property interest? I would ask the Moore Supreme Court about that, Your Honor. I mean, the Moore Supreme Court – Ah, but see, Moore cuts the wrong way for you, doesn't it? Because they could have just said, we don't have to mess with any of this. It's not property. We don't have to mess with – You know, they had to reach that issue. They had to settle on the grounds they did because they presupposed, although they didn't hold it, they presupposed it's property. They could have just laughed it away and said, ah-ha, no property interest here. We don't have to bother with this. Well, they also could have said, we don't – Moore has a sentence that says we don't need to force this square peg of privacy and dignity and interest into the round hole of a property right. Had Moore really been about, you know, assuming this were a property interest, they could have simply said there's no conversion claim because you gave away your genetic material. You consented to have it donated. Or they could have said there's no conversion claim because it's not property. It didn't say that. No, it didn't go so far as to say that. But it said that this – Maybe it didn't go so near as to say that. It seems to me that's the easy way to decide. Moore is to say, what are we talking about here? It's not property. Because this involves a privacy liberty interest that does happen to involve something that has a physical manifestation out there. Why is it – let's say the complaint will allege something different. And again, here's the painful question of possible amended complaints. But, you know, we have to worry about other people and other complaints and other cases. And let's say, you know, we did this procedure because we don't like to give sort of traditional Christmas presents. You know, we don't like to go shopping. And what we'll do is donate zygotes to our best friends. You know, we don't like little children ourselves. We don't want to raise them. But we think we're pretty special. I'm sorry. Last few people. We're the plaintiffs. Okay. You know, husband and wife, we don't really like children much. We think adults are fine, but we like to skip the first 21 years. But we think we're pretty special. So what we're going to do is we're going to fertilize some eggs, some of the wife's eggs with her husband's sperm, and donate them, give them to our friends so they can have the pleasure, the benefit of having our children. If you're thinking about that ever for me, would you make sure mine is Arnold Schwarzenegger? Arnold seems to be very popular around here. What does that have to do with ‑‑ I mean, it can in many cases, in most cases, where people go through this procedure. It usually, often, always perhaps does involve a reproductive choice. But that's not all that's involved. You can give it away. It is transferable among people. If the legislature did not prohibit the sale, they could be sold. I mean, no doubt about it that people would buy these things, isn't it? About the embryos. Yes. Plaintiffs have alleged that. So for pleading purposes, let's assume that. I mean, there are lots of things that you can't sell, even though they are clearly property, heroin is property, right? But you can't sell it unless you have a permit from the ‑‑ I couldn't sell my heart right out of my body, but I can give it away once I die, if it's healthy. I mean, there may be ‑‑ just because it's tangible doesn't mean it's property to me. Well, no, I mean, it's very easy to say, look, if it's within the human body and it's part of the human body, it's not property. This thing is not property. But bam, once it gets chopped off, why does it become property? Well, that's what you just described, Your Honor, the personal injury. No, no, no, no. I'm not saying anybody chopped it off. Let's say I accidentally chopped it off. You know, nobody's fault but my own. It's now no longer connected to me. Why is it my property? Why can't I give it to my brother, if I have a brother, or bronze it and, you know, leave it for the Kaczynski Foundation as sort of a shrine? Well, I'd have to ask ‑‑ Huh? You know, I'd have to ask why isn't it property for which purpose? I mean, are we talking for California or for purposes of civil repo? That I don't understand. Well, let's start with California. Let's say I decide this is my finger and I chopped it off accidentally. It's a very valuable thing. Future generations would love to have the Kaczynski finger. And so I have it put in a new site, you know, one of those things. And I have it sitting on my mantelpiece. And some night, dastardly burglars come in and they steal it. Take nothing else. They realize it's a valuable thing. And so ‑‑ Are they going to be ‑‑ I mean, they broke in, so they will be guilty of burglary. But would that be a larceny? Honestly, I don't know how the court would assess such a loss. Any reason it wouldn't? I mean, I've not only got the finger there, but I spent all that money putting it in a new site. For purposes of repo, I really don't understand how the court would ‑‑ No, no. I'm asking you for purposes of California law. Well, the California law, the statute on property is broad, as the Court knows from the first Oscar opinion. But the Moore opinion states that with genetic ‑‑ The first and reversed Oscar opinion? Is that the one you're talking about? Yeah, the one that preceded the en bas. And so ‑‑ Preceded in a way that sort of a ‑‑ Sort of blazed it. A pedestrian precedes a truck that runs. But Moore basically said the court with genetic materials should look to the specialized statutes. And so that means to me we look to 357G, the California Penal Code statute. And what is that? Which one? I get them confused. That's the one that describes the misappropriation of material outside of ‑‑ genetic material outside of a consent as a personal injury. I mean, that's how that's organized in the code. And the health and safety code ‑‑ And does it say it's my property? Or is it just simply ‑‑ Well, the heading describes it as personal injuries. It's organized that way on this sort of decision tree. So that indicates to me that the legislature more thinks of this as the deprivation of which would have remedies under personal injury state law, which the plaintiffs are free to pursue and are pursuing. You know, their state law claims were dismissed without prejudice. And at least four of those state law claims ‑‑ Let's say that these have an unfortunate accident and died and in their will left these things to the heir, heirs, whatever. Is that transfer valid? Is the transfer valid? Yeah. Well, the closest case I would come up with for that would be Hecht, which seemed to indicate that, you know, as a way of recognizing a, I don't know, possessory interest in this material, it would at least honor the probate code for this. It seems to me, though, still the very last case cited in Hecht is a case about privacy. How about the lock of Elvis' hair? Is that property? Not to me. Go on eBay, you know. You can do very well with a lock of Elvis. I suppose it would be. Okay. How about a fingernails of one of the saints? Or bones of one of the saints, let's say. Well, it seems to me some human material could be priceless. I mean, there may be a value that's attached to it, but what, you know, just ‑‑ It could be sold. It doesn't mean that, you know, just because you want it. We know human material is sold all the time. Cadavers are sold, parts, skeletons, human skeletons are covered and then they can be sold. I mean, I know they make them out of plaster and plastic, but you can get a real human skeleton using real human bones. If you find, go into the desert or go to Egypt and excavate a mummy, that can be transferred, even though it involves human remains. Your Honor, before I answer, I meant to reserve some five minutes for my co‑counsel. So I can attempt to answer that. I mean, I assume that if somebody pays a certain amount for that mummy or human bones or saint's fingernails, then their property would be the amount they paid for that material. But here what we have is ‑‑ But the material itself would not be property? The saint's fingernails would not be property? Well, the saint's fingernails would be the occasion for the exchange of that property. The property of the plaintiff's lot. I go in the morning. You know, I pay somebody $100 for the saint's fingernails. Okay. And then they've got $100. I've got the saint's fingernails. I get mugged, and the mugger takes a little baggie with the saint's fingernails. And you would then determine the value of the fingernails by what you paid for the fingernails. But here we're dealing with plaintiffs who paid for a quarter of a fingernail. But that's just valuation. You don't dispute that the saint's fingernails would be a property, do you? I suppose if somebody is paying something for the saint's fingernails and regards it as property. And the fact that it happens to at one point have been part of a human body does not in any way affect the fact that this is now a commodity property. For fingernails, maybe. For embryos, I don't know. Hair. How about bones? Bones. Bones are probably also sold. You know, bones are now made into a skeleton that is used for anatomical purposes. I mean, I feel, Your Honor, I feel like we're dealing with material here that's got metaphysical implications that aren't necessarily the same as those inherent in hair or bones or fingernails. Okay. What are those metaphysical implications? I wish I knew, Your Honor. Well, you suggested it. You said you think these things have metaphysical implications. And ta-da. Tell me what they are. Well, as Haig described it, the potential to create human life. That's the metaphysical, in a nutshell, the metaphysical implications of what's at stake here. So if you could take a follicle of human hair, extract the DNA, inject it into a cell, and clone the human being, that would give the hair metaphysical implications? I'm sorry. I missed the very last part because someone coughed. You take the DNA out of human hair. You know human hair has, you know, you can figure out blood types and things like that from human hair, right? So if you can extract DNA from human hair, and let's say we get to the point where you can then use that DNA to clone that human being, that would suddenly infuse the lock of hair with Elvis's lock. So you could have a new Elvis. That would take the lock of Elvis's hair that's been a commodity previously and imbue it with metaphysical implications. If cloning were permitted in California the way embryonic implants are permitted. It doesn't matter whether it's permitted or not. It's enough that it should be possible. The metaphysical implications exist regardless of what is legal. If you can do it, if it's capable of being done, then I would assume the metaphysical implications exist, no? I'd assume so. This may be a point where the metaphysical implications run at loggerheads. I've taken up a good bit of your time. Why don't we give your co-counsel, who's looking there very anxiously, three minutes, because you took some of that extra time yourself. How about three minutes? Thank you, Your Honor. Eric Wise for defendant, for Appellee Memorial Health Services. On the first point, the fundamental point of this case and why this is not property is because we are dealing here with embryos that have the potential for human life, that develop into human life directly, and that's the point. Let's say they got squashed or they got irradiated. Immediately before whatever bad happened to them happened, they happened to pass by the x-ray machine and they were carelessly left there without a lead cover, killing all potential for human reproduction. That would be a different case than this. Of course it's a different case. You think I'd give hypotheticals that are the same case? What would be the point of doing that? Well, the point is that... Okay. How would that case be different? I take it by saying it's different. You're conceding that at that point it is property. Absolutely. Right. Okay. So as soon as you zap them with radiation and kill them, kill the potential for human life, it becomes property. Right. Magically, property appears in a petri dish. Yes. Okay. Why? Why is the thing that looks to the naked eye the same, but is now less? Because you've sort of taken away the potential for human life. Why does that change it into property? For precisely the reasons discussed in Davis, in the various treatises that were presented to the district court, and in the professional ethical treatise about the nature... You know, you're citing a lot of stuff I don't remember. Why don't you just tell me? Okay. Because it's so clear. Because of its potential to become a human being. In other words, the debate is, is this property or is it a person? In some states, in Louisiana, for example, the statute specifically says that an embryo is a person. So in order to accommodate the various... So you would say my finger isn't that because it can't become a human being. That's correct. Until the day next year or so when they figure out how to clone me by using part of my finger, then it ceases being property. That's exactly right. And then that's why... And when we can clone to the common, then the mummy ceases to be property, too. That's... Well, I'm not sure about that, whether it's... It's a clear implication of what you're saying. It might remain property if it were not to be used for cloning. It could be. It might be. But when you extracted the DNA material, that DNA material is no longer property. The mummy itself probably would remain because it has other purposes. What about blood? Blood. I think blood is the same point. We know people sell blood and sell serum, right? Sure. Parts of human body? Yes. Live? If it weren't alive, we wouldn't want it, right? Dead blood is no good to us. They sell... People sell parts of human bodies. And that is property because people sell parts of human bodies? I'm sorry. People sell parts of human bodies? Live parts? No, not live parts. I'm talking about blood is the best example. Right. And that is property within the definition, I think, of RICO. But not embryos because embryos have a potential for human life. Precisely. And I think that that... And run by me once again the distinction. Why does that potential use of them? Because in the last... Whereas it could also be used on salad, right? No. The reason is because... You could. It wouldn't be good. But this is a — I think it's because of a policy, philosophical, religious decision that has to be addressed. I can certainly see where the state would have an interest that would allow it to limit the use of certain kinds of property because they have potential for life, just as they limit the sale of alcohol or the sale of guns. And there are all sorts of limitations on the use of property. But why does a potential for life cease to make it property? Where does that come from? I think it's sui generis, John. These are new issues that have never been addressed. And the reason that it doesn't is because outside of the strict definition of property developed in 16th century England and through our jurisprudence arising out of that, we now have a situation where we have tangible items that reflect the potential for human life. And the question is, what do we do about it? And the answer that has been developed... Why isn't the answer, there are property just like every other tangible thing, but its use can be restricted, just like use can be restricted of other dangerous or sensitive, whatever kinds of property? Why isn't that the more plausible answer to what you're opposing? Because I think common human experience, intuition, and religious and moral considerations, which are all taken into account by the Davis case, by Hecht, and by the professional societies that have dealt with this, the doctors that have dealt with this. The middle ground is that this is an interim category, which reflects the moral concern regarding the nature of this material, that it is, in fact, potentially, it can become a person. Okay. I think your time's up. Thank you. Let's see. You had 2 minutes and 37 seconds. We'll round it up to 3 minutes. Thank you, Your Honor. Penal code section 367G has nothing to do with finding, holding someone criminally responsible for committing a personal injury. 367G was designed according to the language of the bill that enacted the statute to address a situation which was actually brought to light as a result of the first approximate 60 cases that had been discovered in this matter back in 1995. They should have discovered this matter back in 1992, but they didn't because the administration did not allow for the information and their knowledge of it to go forward. This statute, despite its location in the statutes, and I'm not sure if anybody, maybe I'm missing a decision. I've never seen a decision where 12b-6 was granted on the basis of a determination by a district court judge that he thought or he believed, even though I think he recognized that he did not actually know, that the legislator's intent behind placing that statute within the penal code in a particular section had some implication as to its being intended to define a personal injury. Oscar was a 12b-6 case, wasn't he? I'm sorry, Your Honor? Remind me. Oscar was a 12b-6 case, wasn't he? I believe Oscar was a 12b-6 case, but I believe Oscar and some of the other cases that you have dealt with in this circuit deal with very intangible interests, the right to habitability of a particular apartment. Yes, but we always say that they don't get anywhere under RICO. Well, I agree, but there's a very big difference between an intangible right to habitation versus an embryo or an ova that the reason why it was taken in the first place was to make the kind of money or be part of the kind of research projects that were going to allow for participation in extremely high financial rewards from the techniques that were developed as a result of having the supply of embryos that could be researched upon. And you'll be hearing more and more today about a process called PGD, and it is making news right now. It is the research that was conducted and alleged in the complaint to have taken place, which these embryos were taken for, was to design a technique by which to ferret out and determine in advance of implanting the embryo whether someone has the type of genetic disease or anomaly that you normally would not be able to find until you were third trimester into a pregnancy and were going through an AMAN. It is a remarkable revolution, and it is going to sign and mark a revolution in medical and health care today. The only reason why it goes forward is because people like the appellants were victimized. Now, maybe they don't have that much of an economic or commercial interest in their embryos as the defendants do, but let's not miss that part of the equation. The defendants had the financial interest. It was their specific intent to carry out this conspiracy, to take these and to sell them so that they could make more money or to participate in research that will eventually garner a huge amount of money. Are you alleging or do you believe the complaint alleges that your clients were induced to undergo more of these aspirations and pay for them and more of the fertilizations because the defendants were hoping to get surpluses that they could then harvest and use in their research? That's correct, Your Honor, and we do. We make it very clear. We know of. I'm sorry. The answer is yes. I just want to make an assertion. I asked do you allege that, and your answer is yes, you do allege that. Yes, we are making that assertion, Your Honor. You are making that assertion, and then you get into the discussion. You have this, Judge Fernandes, about whether you raise that in this court, whether you adequately raise it in your complaint. But what you are saying to me is were you allowed to – I'm not saying you will be – were you allowed to amend your complaint, this would be a claim you would be prepared to raise. Is that what you're representing to us? If more factual development was needed on that claim, absolutely, Your Honor. We would do that. You had a little mumble qualifier there. I'm sorry? You had a little mumble qualifier there. No, we would. I'm sorry. We would, absolutely. If more factual development was needed, then we would go ahead and take the case study. We're talking complaint here. We're talking complaint here. The only thing you need for a complaint is a good faith basis for making an allegation. So what I'm really asking is were you – now that you're fully aware of this issue, maybe you did raise it, maybe you didn't raise it, maybe it's too late. I don't know. But what I'm saying is now that you're fully aware of this aspect of the case, were you given a chance to amend – In fact, we have other case studies that show – That's all I'm – And just to wrap that up, Your Honor, the gist of what we were – The gist of what we've already alleged is – and we can't, obviously, we aren't going to state it without having some further evidence, but we can't get to the evidence until we get through the gatekeeper here. And the fact of the matter is we definitely contend this woman, after two years – You know, you now spend your three minutes into six minutes, and it's okay to finish up, but you just keep adding and adding and adding and going and going.  I'm sorry. I think we're – time's up. If I may just conclude, Your Honor, I believe that this case presents a situation that's very tough in terms of defining RICO. However, this is not such an intangible property interest that is so unqualifiable that it couldn't fit within the parameters of the RICO statute, and especially because of the need and demand for these materials as part of medical advances. You have to get to a period. You really do. Thank you. Thank you very much, Your Honor. The case is argued and submitted.
judges: Kozinski, Fernandez, Rymer